UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. LAMAR BLAKEMORE,<br><br>        Petitioner,<br>   v.<br><br>RANDY GROUNDS, Acting Warden,[1]<br><br>        Respondent. | )<br>)<br>)<br>)<br>)<br>)   No. 08 C 5013<br>)<br>)   Judge Rebecca R. Pallmeyer<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

In 2005, following a jury trial, Petitioner Lamar Blakemore was convicted of possession of a stolen motor vehicle (he was acquitted of the related charge of robbery). He was sentenced to a term of 17 years' imprisonment. Petitioner has now filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254, arguing that his right to confrontation was violated by the court's ruling limiting his cross-examination of the state's key witness, and that he was denied a fair trial when the court tendered only the first of the two-day trial's transcripts to the jury. For the reasons set forth below, Blakemore's petition for habeas corpus relief is denied.

## BACKGROUND

**I.    Factual Background**

The state court's factual findings are presumed correct for the purpose of a federal habeas review unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Daniels v. Knight,* 476 F.3d 426, 434 (7th Cir. 2007). Clear and convincing evidence is that which shows a fact to be "highly probable." *See United States v. Boos*, 329 F.3d 907, 911 (7th Cir. 2003). In an apparent effort to meet that standard, Petitioner has submitted an affidavit with his petition for habeas corpus relief, in which he asserts that he never met the state's main witness, Theresa Black, until his trial, and that he never had possession of the vehicle in question. (Blakemore Aff.

---

[1] As Petitioner is now housed at the Robinson Correctional Center, the Warden of that facility is substituted as Respondent.

¶ 1.) That affidavit, however, appears to have been prepared some time in 2008; there is no indication it was ever submitted to the state courts and therefore is not properly before this court on habeas review. *See Bradshaw v. Richey*, 546 U.S. 74, 79 (2005). No further argument or evidence of any kind is presented in support of these assertions. Accordingly, the factual account set forth below is drawn from the opinion of the Illinois Appellate Court on direct appeal *People v. Blakemore*, No. 1-05-1355 (1st Dist. Ill .App. 2007) (Order, Ex. D to Respondent's Answer (hereinafter "Resp's Ans").)

Chicago Police Officer Borum (his first name is not in the record) testified that on September 20, 2003, he received a telephone call about a woman found unresponsive in a brown Oldsmobile on the 3800 block of Michigan Avenue in Chicago, Illinois. (*Id.* at 6.) When questioned, the woman, who had been sleeping in the car, identified herself as Theresa Black (*Id.*) While conversing with Black, Officer Borum ran the license plate number of the Oldsmobile. (*Id.*) When the report came back indicating that the car had been stolen, Officer Borum transported Black to a nearby police station for further questioning. (*Id.*)

The state called Black to testify at Petitioner's trial. She recounted that on September 19, 2003, she was selling crack cocaine on the corner of 44th Street and Prairie Avenue in Chicago when Petitioner drove up in a beige car. (*Id.*) Petitioner told Black that his name was Gary and that he owned the car. (*Id.*) He showed her the vehicle's title as well. (*Id.*) When Petitioner asked Black if she knew anyone to whom he could pawn the car, Black responded with an offer of her own: twenty dollars' worth of crack cocaine in return for her renting the vehicle for one day. (*Id.*) Petitioner agreed to this proposal, Black testified, and told her to return the vehicle to him the next day at a service station at 47th Street and Michigan Avenue. (*Id.* at 4.) After she explained this series of events to police, Black testified, officers showed her a group of photographs and she identified Petitioner as the man who gave her the car. (*Id.*)

During cross-examination, Black admitted that her real name was Tanya Tilden and that on the occasion of her arrest she had given police the false name of Theresa Black. (*Id.*) Black confirmed that she had given other false information–including more than 20 false names–on the 79 other occasions that she had been arrested for various offenses. (*Id.*) She admitted that she had been arrested at least once for prostitution. (*Id.*) While the state appellate court's account of the evidence makes no mention of Black's prior criminal convictions, the trial record and the parties' briefs reveal that defense counsel thoroughly questioned Black about one of her earlier convictions, and Black had 27 other prior convictions that were not explored on cross-examination. (Def.'s Appeal Brief, Ex. A to Resp.'s Ans. at 32; State's Appeal Brief, Ex. B to Resp.'s Ans. at 8.)

Black admitted that she had used heroin earlier on the day that she received the car from Petitioner, though she denied being high at the time that she talked with police. (*Id.*) Black also confirmed that she had not been charged with selling crack cocaine in connection with her arrest, even though her account of the events on September 19 included an offer and exchange of cocaine for the use of the car. (*Id.*) Black further admitted on cross that she had been unable to identify Petitioner from a group of photographs that were presented to her by defense counsel before the trial. (*Id.*) Nevertheless, Black did identify Petitioner in court as the man who had given her the stolen car on September 19, 2003. (*Id.*)

The stolen car belonged to Kenneth Becker, who in September 2003 lived in an apartment on Chicago's north side. (*Id.* at 6.) At trial, Becker testified that on September 11 and 12, 2003, he had twice traveled to the lakefront near Wilson Avenue, where he had met a man who, Becker indicated, looked like Petitioner. Becker—who, this court infers, is elderly or disabled in some way—explained to the man that he was looking for a "caretaker" but could not afford to hire someone full-time. (*Id.*) Becker offered to pay the man a modest fee if he would move in with Becker and take care of him. (*Id.*) Following this exchange, the man returned with Becker to his apartment, where Becker introduced the man to the landlord, Betty Lowe. (*Id.*) The man lived with

3

Becker for the rest of the week, and on several occasions throughout the week Becker did in fact pay the man twenty dollars. (*Id.*) Becker testified that he had previously hired men and women from Catholic Charities to care for him, but the man from the lakefront was the first caregiver he had ever met in the park. (*Id.* at 3.) Becker also explained that he owned a 1994 light-brown Oldsmobile, and that he had never given anyone permission to drive the car except when he was in the vehicle. (*Id.*)[2]

At about 8:45 p.m. one evening near the end of the first week that the man from the park lived with Becker, Becker was assaulted in his bedroom. (*Id.*) Becker testified that as he entered his bedroom that night, a man approached him from behind and announced, "I'm going to tie you up." (*d.*) The man then forced Becker to lie face-down on the bed and threatened to kill him if he attempted to get up. (*Id.*) Although Becker could not see his assailant, he testified that he recognized the voice as belonging to the man that he had hired as his care provider. (*Id.*) Eventually, Becker was able to roll off the bed and into the living room, where he freed himself with a pair of scissors and proceeded to call the police. (*Id.*) The assailant had taken some cash as well as the keys to Becker's apartment and car. (*Id.* at 2-3.)

Police responded to the apartment and found Becker with his wrists swollen and his bedroom looking as if it had been ransacked. (*Id.* at 5.) When they discovered that Becker's vehicle was missing, they reported the car as stolen, using Becker's insurance card to get the vehicle identification number. (*Id.*) Officer Christopher Schenk testified that he interviewed Becker, who was sketchy about his companion's last name, but did tell Schenk that the name was something "like Brockmyer, Brockmeyer." (*Id.*) Chicago Police Detective Landgraff testified that he obtained the name "Lamar Blakemore" from a sign-in sheet in the lobby of Becker's building.

---

[2] Becker's live-in arrangement with a complete stranger that he met in a park is curious. The state court's opinion is silent, however, concerning the reasons that Becker may have had for seeking out a companion at the lake front, and it provides no explanation for how a man in need of an assistant's care could get himself to and from the park in the first place.

4

(*Id.*)  At Landgraf's request, officers ran that name against a police database and found an image of Petitioner from an earlier police line-up.  (*Id.*)  The photograph showed Petitioner and several other men standing in the line-up.  Landraff presented the photograph to Becker.  Becker did not immediately recognize Petitioner, but, after Landgraf told him to take into account the possibility that a person might change his appearance, Becker did pick Petitioner out from the other men in the photograph.  (*Id.*)  Landgraf testified that Becker told him that Petitioner had shaved his head and beard. (*Id.*at 6.)  Becker also identified Petitioner in court as the man who had lived with him.  (*Id.* at 3.)

The defense presented several witnesses in its case, although Petitioner himself exercised his right not to testify.  (*Id.* at 9.)  Noel Zupancic, a criminal investigator, testified that when he interviewed Theresa Black, Black reported that the investigating officers had warned her "that they would have to charge her with the case if there was no identification made.  She said that she was held in the police station for a couple of days and she did see a lineup and she did make an identification."  (*Id.*)  Zupancic further testified that he interviewed Black again on the first day of trial and showed Black the same group of photos that she had been shown by police.  (*Id.*)  Black could not identify anyone from the photographs, Zupancic testified, although Petitioner was again included in the group.  (*Id.*)

Betty Lowe, Becker's landlord, also testified.  (*Id.*)  She recalled that (at some point not identified in the court's opinion) Becker had complained about guests in his apartment stealing things from him.  (*Id.*)  Similarly, Robert Fox, another resident in Becker's building, testified that Becker had often complained about his "caretakers" stealing from him (again, the court's opinion does not refer to the dates of any of these complaints).  (*Id.*)  Fox further testified that Becker had "indicated" during a subsequent conversation with Fox that two people, not one, had been involved in the September 18, 2003 robbery of Becker's apartment.  (*Id.*)  After the close of testimony, the defense requested a jury instruction relating to narcotics addiction and witness credibility.  (*Id.* at

5

9-10.) Judge James B. Linn denied that request, explaining that the jury would instead be given standard instructions on judging the credibility of witnesses. (*Id.* at 10-11.) He noted that the defense was free to argue that Black ought not to be believed because of her drug use and addiction. (*Id.*)

During their deliberations, the jury requested transcripts of the entire two-day trial. (*Id.* at 11.) At that point the court reporter had prepared only the first day's transcripts, which included just a portion of the prosecution's case-in-chief. (*Id.*) The court did not yet have a copy of that day's transcripts, which included the remainder of the prosecution's case-in-chief and all of the defense case. (*Id.*) The defense objected to providing the first day's transcript, but the trial judge overruled the objection, explaining, "It's my job to help the jury with deliberations. They are making a request which is easily provided for. They are asking for transcript. We have yesterday's at the moment, we do not have today's. I'll give them what we have. I'll explain that's all we have." (*Id.* at 11.) Together with the transcripts of the first day of trial, the court gave the jury the following instruction: "Enclosed are yesterday's transcripts. They are all the transcripts available. Today's testimony has not been transcribed and cannot be available to you. Please rely on your collective memories of all the evidence. Please continue your deliberations. Signed, Judge Linn." (*Id.* at 12.) Following deliberations, the jury acquitted Petitioner of the robbery charge but found him guilty of possession of a stolen motor vehicle. (*Id.*) Petitioner was sentenced to seventeen years in prison. (Order, Ex. D to Resp's Ans. at 1.)

**II.    Procedural History**

Petitioner took a timely direct appeal in the state courts, claiming that: (1) the evidence was insufficient to prove Petitioner guilty beyond a reasonable doubt; (2) the trial court's jury instructions were inadequate and improper; (3) the trial court erred by providing the jury with only a portion of the transcript; (4) the trial court denied Petitioner's right to confront witnesses by curtailing his cross-examination of Theresa Black and barring evidence of all but one of her previous convictions;

(5) prosecutors acted improperly by introducing evidence of Petitioner's criminal history and his incarcerated status; (6) the seventeen-year sentence was excessive; (7) the *mittimus*, or warrant of commitment to prison, improperly reflected a conviction for aggravated battery; (8) the court improperly assessed an additional fee on Petitioner. (Def.'s Appeal Brief, Ex. A to Resp.'s Ans. at i-vii.). The appeals court affirmed the judgment of the trial court with respect to the conviction and sentencing, amended the *mittimus* to reflect only the possession of a stolen motor vehicle conviction, and corrected the erroneous fee. (Order, Ex. D to Resp's Ans. at 22.)

Petitioner sought a rehearing, but that request was denied on November 9, 2007. (Order, Ex. F to Resp's Ans.) Thereafter, Petitioner filed a petition for leave to appeal (PLA) in the Illinois Supreme Court, raising, among other issues, the claims that he was denied his confrontation rights and that he was denied a fair trial when the jury received only the first of the two-day trial's transcripts. (PLA, Ex. G to Resp.'s Ans. at 3.) The Illinois Supreme Court denied Petitioner's PLA on January 30, 2008. (Order, Ex. H to Resp.'s Ans.)

Petitioner filed the instant petition for federal habeas corpus relief on August 27, 2008. (Pet. At 9.)[3] The petition raises two claims that Petitioner had previously raised in his state-court appeals. (*Id.* at 5-6.) In Claim One, Petitioner again asserts that he was denied his right to confront witnesses when his cross-examination of Black was curtailed. (*Id.* at 5.) In Claim Two, Petitioner asserts that the provision of only part of the trial transcript to the jury abridged his right to a fair trial. (*Id.*) The petition is on a pre-printed form, and in the space designated for a third claim, Petitioner refers only to factual matters raised by Theresa Black's testimony and makes no allegation of error nor any reference to a constitutional right or principle. (*Id.* at 7). The court construes this portion of the petition as an argument in support of Petitioner's claim regarding his right to confront Black

---

[3] Petitioner's habeas corpus petition includes two pages numbered "5." To avoid confusion, the page numbers assigned by the Clerk of the Northern District located on the top of the page will be referenced here.

(Claim One). Respondent concedes that the petition is timely, and that Petitioner has properly exhausted all available state court remedies. (Resp.'s Ans. at 5-7.) Respondent argues that both of Petitioner's claims fail on the merits. (*Id.* at 9, 13.) As discussed below, this court agrees with Respondent's position that Petitioner is not entitled to habeas relief.

## DISCUSSION

Under the Anti-Terrorism and Effective Death-Penalty Act of 1996 (AEDPA), this court may grant habeas corpus relief only when a decision by the state court is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d); *Virsnieks v. Smith,* 521 F.3d 707, 713-14 (7th Cir. 2008). A state court's decision is "contrary to" clearly established federal law if "the state court arrive[d] at a conclusion opposite to that reached by the [Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court]." *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495 (2000). A state court's decision is an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not have applied or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407. An "unreasonable application" of federal law must not only be incorrect, but must lie "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002). The court evaluates Petitioner's claims with this high standard in mind.

### A. Claim I - Petitioner's Right to Confrontation

Petitioner claims that he was denied his Sixth Amendment right to confrontation when the trial court cut short his cross-examination of Theresa Black after defense counsel had questioned Black about just one of her several prior convictions. (Pet. At 5, 7.) Petitioner's confrontation argument is belied by the record. Petitioner's own lengthy citation to Black's testimony demonstrates that defense counsel thoroughly impeached Ms. Black. The jury heard evidence that Black had previously and on the occasion of her arrest given false names to the police; that she had used heroin on the very day that she received the car from Petitioner; and that she had been arrested numerous times before. (*Id.* at 7). Given this evidence, the Illinois Appellate Court reasonably concluded that the trial court acted within its discretion when it limited further cross-examination regarding Black's prior convictions.

Petitioner argues that a trial court may not limit cross-examination based on its belief that the witness has been sufficiently impeached. (*Id.* at 5, 7.) To the contrary, the Supreme Court has held that, in general, trial courts do have wide discretion to limit cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). As long as the trial court does not curtail cross-examination to the point that the defendant is unable to expose the witness' bias and motivation to lie, the reasonable limitations imposed by the court do not rise to the level of a Sixth Amendment violation. *Id.* at 678-79; *see also United States v. Sasson,* 62 F.3d 874, 882 (7th Cir. 1995). If the defendant is given sufficient opportunity "to expose a motive to lie, it is of peripheral concern to the Sixth Amendment how much opportunity defense counsel gets to hammer that point home to the jury." *United States v. Nelson,* 39 F.3d 705, 708 (7th Cir. 1994). The fundamental question when dealing with potentially cumulative cross-examination is "whether the jury had sufficient information to make a discriminating appraisal of the witness's motives and bias." *United States v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) (citations and internal quotations omitted).

In finding that there was no error in the trial court's decision to limit the defense's cross-examination of Black, the Illinois Appellate Court relied upon an Illinois state case, *People v. Blue,* 205 Ill. 2d 1, 13-14, 792 N.E.2d 1149, 1155-56 (2001), which in turn adopts the standards set forth in a number of Supreme Court decisions, including *Van Arsdall*. (Order, Ex. D to Resp.'s Ans. at 19.) The Appellate Court concluded that the defense was able to impugn Black's credibility through substantial cross-examination dealing with one of her many prior convictions, her drug use, and her use of false names and information during prior encounters with law enforcement. (*Id.* at 18-19.) This court agrees. The defense elicited testimony that Black's real name was Tanya Tilden, that she had given at least 20 other false names and other false information during her 79 previous arrests, that she had used heroin on the day she received the stolen car, and that the police had not charged her with selling crack cocaine despite her inculpatory admissions. (*Id.* at 4). Given this thorough exposition of Black's questionable background and treatment by law enforcement, it was reasonable for the state appellate court to find that the jury had heard sufficient evidence to evaluate Black's bias and motive. Because the Illinois Appellate Court relied on and appropriately applied the relevant Supreme Court precedent in this case, Petitioner is not entitled to habeas relief on this basis.

**B.    Claim II - Denial of a Fair Trial**

Petitioner's second claim is that he was denied a fair trial when, in response to the jury's request for the entire trial transcript, the court provided only the completed transcript from the first day of the trial. (Pet. at 5.) At the time of the jury's request, only the transcripts from the first day's proceedings had been prepared. (Order, Ex. D to Resp.'s Ans. at 11.) The second day's transcripts were not yet available. (*Id.*) As a result, the transcripts delivered to the jury covered only the state's evidence. Had the second day's transcripts been available, they would have contained the remainder of the prosecution's case-in-chief and the entirety of the defense's case.

(*Id.*) Petitioner asserts that the trial judge's decision on this matter was a violation of his rights to Due Process and Equal Protection under the 14th Amendment. ( Pet. at 6.)

In both Illinois and federal courts, the question of whether to comply with a jury's request for transcripts is distinctly within the trial court's discretion. *United States v. Howard*, 80 F.3d 1194, 1202 (7th Cir. 1996) (citing *United States v. Guy,* 924 F.2d 702, 708 (7th Cir. 1991); *People v. Williams*, 173 Ill.2d 48, 87, 670 N.E.2d 638 (1996). Thus, a trial court's decision to provide transcripts in response to a jury request is unlikely, on its face, to implicate a defendant's constitutional rights, and such a decision is reviewed only for abuse of discretion. *Guy,* 924 F.2d at 708. Given the wide latitude granted to the trial court to address such matters, Petitioner's constitutional claim is exceedingly tenuous. While different jurists might disagree about the wisdom of providing a jury with only a partial transcript in response to a request for a complete transcript, this court simply cannot conclude that such an action violated Petitioner's right to a fair trial.[4]

More importantly, to obtain habeas relief a petitioner must demonstrate that a state court decision is contrary to or an unreasonable application of Supreme Court precedent–and this requires that there in fact be a Supreme Court case addressing the essential propositions put forth by the petitioner. *Carey v. Musladin*, 549 U.S. 70, 76-77 (2006); *Schaff v. Snyder,* 190 F.3d 513, 522 (7th Cir. 1999). Thus, in order to obtain relief, Petitioner must show that there is a clearly

---

[4] The trial court's decision to provide the jury with just one day's transcripts may not have been the best course. Both the state and federal case law cited by Respondent here uphold the trial courts' refusal to provide any of the transcripts requested by the jury. *People v. Kliner,* 185 Ill.2d 81, 163, 705 N.E.2d 850, 891 (1999); *Cramer v. Fahner,* 683 F.2d 1376, 1386 (7th Cir. 1982); *Guy*, 924 F.2d at 708; *Howard,* 80 F.3d at 1202. In each of those cases, the jury had requested only certain portions of the transcript, and the trial judge had denied that request. The prevailing logic supporting the denials is that sending only partial transcripts would "unduly highlight" the testimony contained in those transcripts. *See Guy*, 924 F.2d at 708. Notably, in both *Guy* and *Howard,* the fact that the trials in question were short and that the testimony in the requested transcripts would have been fresh in the juries' minds is cited as further support for the judge's decision. *Guy,* 924 F.2d at 708; *Howard*, 80 F.3d at 1202. In the case before this court, it might well have been prudent for the court to simply deny the request for a transcript in its entirety; his decision to do so does not, however, raise a constitutional issue. .

11

established Supreme Court precedent addressing this issue, and that the state court's decision was contrary to or an unreasonable application of that precedent. Petitioner has cited no Supreme Court case, however, and this court is aware of none, that addresses how a jury's request for transcripts should be handled by a trial court either as a general matter or where, as here, only part of the requested transcripts are available. Petitioner's state court briefs likewise contain no references to any on-point Supreme Court decisions. (Def.'s Appeal Brief, Ex. A to Resp.'s Ans. at 24-26; Def.'s Appeal Reply, Ex. C to Resp.'s Ans. at 10-11; Def.'s Rehearing Pet., Ex. E to Resp.'s Ans.; PLA, Ex. G to Resp.'s Ans. at 13-15.) Where case law furnishes no answer to the question at issue, let alone one that is clear and in a petitioner's favor, it is impossible to say that the state court made an "unreasonable application of clearly established Federal law." *Wright v. Van Patten*, 552 U.S. 120, 126, 128 S.Ct. 743, 747 (2008).

In this case, the state appellate court properly applied an abuse-of-discretion standard when evaluating the actions of the trial judge and found no such abuse. (Order, Ex. D to Resp.'s Ans. at 17-18.) The court noted that the transcripts that were provided contained only a portion of the state's case-in-chief and that the transcripts contained the full cross-examination of each of the state witnesses called that day. (*Id.*) The court also observed that the testimony from the second day of the trial, including the entire defense case, would have been fresh in the jury's minds, as those proceedings had ended immediately before jury deliberations began that same day. (*Id.*) Notably, the trial judge also gave an instruction that discouraged the jury from giving unfair emphasis to the testimony contained in the produced transcripts. He explained that the second day's transcripts were not being provided because they were not yet available, and he told the jury to rely on their collective memory of the day's evidence. (*Id.* at 12.) The Illinois Appellate Court's decision that the trial court did not abuse its discretion is not unreasonable or contrary to any established federal law. Nor has Petitioner identified any specific prejudice resulting from the trial judge's decision. The jury heard all of the evidence, and it appears to have considered all of the

12

evidence in rendering its mixed verdict. Petitioner has not established that the trial court's actions violated his constitutional rights, and he cannot meet the high standard imposed by AEDPA for habeas relief. His request for habeas relief is therefore denied.

## **CONCLUSION**

For the reasons stated above, Petitioner Blakemore's petition for habeas corpus is denied. The case is dismissed.

ENTER:

Dated: August 16, 2010

_____
REBECCA R. PALLMEYER
United States District Judge